# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

**HOOD RIVER COUNTY SCHOOL DISTRICT**,

Plaintiff-Appellant,

v.

**STUDENT**,

Defendant-Appellee.

Case No. 3:20-cv-1690-SI

**OPINION AND ORDER**

Joel E. Hungerford and Nancy J. Hungerford, THE HUNGERFORD LAW FIRM, PO Box 3010, Oregon City, OR 97045. Of Attorneys for Plaintiff-Appellant.

Diane F. Wiscarson and Taylar Vajda, WISCARSON LAW, P.C., 3330 NW Yeon Ave. Suite 240, Portland, OR 97210. Of Attorneys for Defendant-Appellee.

**Michael H. Simon, District Judge.**

This case concerns an administrative due process hearing under the Individuals with Disabilities Education Act (IDEA).[1] Plaintiff-Appellant Hood River County School District (District) appeals the decision of an Administrative Law Judge (ALJ) of the Oregon Department of Education (ODOE) Office of Hearings. The ALJ found that the District violated the IDEA and corresponding state statutes and administrative rules. The ALJ further found that those violations resulted in the District failing to provide Student a Free Appropriate Public Education (FAPE).

---

[1] 20 U.S.C. §§ 1400, *et seq.*

The District argues that the ALJ made several errors. Defendant-Appellee Student[2] responds that the ALJ's decision was correct and should be upheld by this Court. For the reasons below, the Court AFFIRMS IN PART AND REVERSES IN PART the ALJ's decision.

## STATUTORY FRAMEWORK

Congress enacted the IDEA to provide federal grants to financially assist state and local agencies in educating students with disabilities. *See Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017). One of the IDEA's goals is to ensure that children with disabilities are provided with a FAPE "that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A). "To accomplish these objectives, the federal government provides funding to participating state and local educational agencies, which is contingent on the agency's compliance with the IDEA's procedural and substantive requirements." *Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1053-54 (9th Cir. 2012); *see also Endrew F.*, 137 S. Ct. at 993 ("In exchange for the funds, a State pledges to comply with a number of statutory conditions. Among them, the State must provide a free appropriate public education—a FAPE, for short—to all eligible children.").

As a recipient of federal funds, the ODOE must ensure that children with disabilities are provided a FAPE and must establish and maintain procedures to ensure those children and their parents are guaranteed procedural safeguards related to the provision of a FAPE. 20 U.S.C. § 1415(a). The state and local agencies also must have in effect policies and procedures to ensure that all children with disabilities residing in the state "who are in need of special education and

---

[2] To preserve the privacy of the minor student, the Court refers to him/her as "Student," his/her mother as "Mother," father as "Father," and parents collectively as "Parents."

related services are identified, located, and evaluated." 34 C.F.R. § 300.111(a)(1). This is known as the state's "Child Find" obligation.

The IDEA ensures children with disabilities receive a FAPE by requiring that state agencies develop a detailed, individualized instruction plan known as an Individualized Education Program (IEP) for those children. 20 U.S.C. §§ 1401(9), 1401(14), and 1414(d). The IEP is "the centerpiece of the [IDEA's] education delivery system for disabled children." *Honig v. Doe*, 484 U.S. 305, 311 (1988). The IEP is a written statement, prepared at a meeting of qualified representatives of the local educational agency, the child's teacher, parent(s), and, where appropriate, the child (the IEP team). The IEP, among other things, includes "the child's 'present levels of academic achievement and functional performance,' establishes measurable annual goals, addresses the services and accommodations to be provided to the child and whether the child will attend mainstream classes, and specifies the measurement tools and periodic reports that will be used to evaluate the child's progress." *Anchorage Sch. Dist.*, 689 F.3d at 1054 (quoting 20 U.S.C. § 1414(d)(1)(A)); *see also Endrew F.*, 137 S. Ct. at 994. The IEP team reviews, and if appropriate, revises, the IEP at least once each year. 20 U.S.C. § 1414(d)(4)(A)(i).

A parent may challenge the conduct of the state by filing a request for a due process hearing. 20 U.S.C. §§ 1415(b)(6), 1415(f). Such a challenge may allege a procedural or substantive violation of the IDEA. *J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 432 (9th Cir. 2010). A procedural violation occurs when a state violates the IDEA's statutory or regulatory procedures in creating or implementing an IEP. *Id.* A substantive violation occurs when a state offers an IEP that is not reasonably calculated to enable the child to receive a meaningful educational benefit. *Id.*

When a due process complaint has been filed, "the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f)(1)(A). Following the due process hearing, the hearing officer—here the ALJ—must provide a decision determining whether the child received a FAPE. 20 U.S.C. § 1415(f)(3)(E)(i).

When analyzing whether an agency provided a student a FAPE, the Court conducts a two-part inquiry. First, the Court considers whether the state complied with the procedures set forth in the IDEA. *Doug C. v. Haw. Dep't of Educ.*, 720 F.3d 1038, 1043 (9th Cir. 2013). Second, the Court determines whether the IEP is reasonably calculated to enable the child to receive educational benefits. *Id.* A state must meet both requirements to comply with the obligations of the IDEA. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley* (*Rowley*), 458 U.S. 176, 207 (1982). The Ninth Circuit has held that "*Endrew* did not change, but rather simply clarified *Rowley*." *M.C. ex rel. M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1200 (9th Cir. 2017).

A procedural violation may result in the denial of FAPE. For that to occur, the procedural inadequacies must have: "(i) Impeded the child's right to a FAPE; (ii) Significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) Caused a deprivation of educational benefit." 34 C.F.R. § 300.513(a)(2); *see also Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001) (stating that "procedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, or that caused a deprivation of educational benefits, clearly result in the denial of a FAPE" (simplified)). "A procedural error results in the denial of an educational opportunity

where, absent the error, there is a strong likelihood that alternative educational possibilities for the student would have been better considered." *Doug C.*, 720 F.3d at 1047 (simplified). "[A]n IEP team's failure to properly consider an alternative educational plan can result in a lost educational opportunity even if the student cannot definitively demonstrate that his placement would have been different but for the procedural error." *Id.*

## STANDARD OF REVIEW

"When a party challenges the outcome of an IDEA due process hearing, the reviewing court receives the administrative record, hears any additional evidence, and, 'basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.'" *R.B., ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir. 2007) (quoting 20 U.S.C. § 1415(i)(2)(C)). Courts reviewing an appeal under the IDEA do not employ the deference framework typically used in evaluating agency decisions, but must give "due weight" to the state administrative proceedings and courts must not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. The Ninth Circuit has established that the "due weight" discussed in *Rowley* is given only to the final decision of the state administrative authority—the hearing officer or the reviewing officer in a two-tiered administrative system (except for certain credibility determinations for which the hearing officer would retain deference instead of the reviewing officer). *See Amanda J.*, 267 F.3d at 887-89.

In considering the hearing officer's (here, the ALJ's) decision, a district court has discretion to decide the amount of deference it gives to the administrative findings. *See Cnty. of San Diego v. Cal. Spec. Educ. Hearing Off.*, 93 F.3d 1458, 1466 (9th Cir. 1996). The reviewing court, however, "at a minimum, must consider the findings carefully." *R.B.*, 496 F.3d at 937 (simplified). The district court also gives "particular deference where the hearing officer's

administrative findings are 'thorough and careful.'" *Id.* (quoting *Union Sch. Dist. v. Smith*, 15

F.3d 1519, 1524 (9th Cir. 1994)). A reviewing court also gives deference to the hearing officer's

credibility determinations of live witnesses. *See Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337

F.3d 1115, 1127 (9th Cir. 2003) ("Normally, a finder of fact's determination of credibility

receives deference on appeal, because access to live testimony is important to the credibility

finding."); *Amanda J.*, 267 F.3d at 889 (recognizing that "a HO [hearing officer] who receives

live testimony is in the best position to determine issues of credibility").

## BACKGROUND

### A.  Student's Relevant Educational Background

The ALJ extensively described Student's experience and interaction with the District and

the Court will not repeat that detailed factual background here. The Court describes Student's

relevant educational background for context in understanding the ALJ's Final Order and this

Opinion and Order.

#### 1.  Head Start: 2016-17 and 2017-18

Student was born on September 16, 2012. In March 2014, Student's pediatrician referred

Student to the District's Early Intervention/Early Childhood Special Education Services (Head

Start) program for screening because of perceived language delays and possible hearing deficit.

In October 2015, the District found Student eligible for special education and related services

under the category of Developmental Delay. The District found Student to have developmental

delays in the categories of Communication, Physical, Social/Emotional, and Cognitive. The

District developed an Individualized Family Service Plan (IFSP) for Student on October 7, 2015.

The IFSP identified annual goals (AGs) in cognitive, social/emotional, adaptive, gross motor,

and expressive communication. In addition, within each specified AG, the IFSP included short-

term objectives (STOs).

Student attended Head Start in the District for academic years 2015-16, 2016-17, and 2017-18. Student attended kindergarten in the District for 2018-19, although Parents removed Student from the District's kindergarten program in January 2019. Parents eventually enrolled Student in a private kindergarten in April 2019. The period in issue for the due process hearing began March 20, 2017, through the date of the filing of the due process complaint, March 20, 2019.

In April and May 2016, District staff commented on Student's growing sensory problems. In September 2016, District staff and Father met to develop Student's 2016-17 IFSP. The 2016 IFSP stated Student's AGs and STOs in quantitative terms. For example, one AG was that Student "will recite at least 2 lines, of at least 4 words, from a familiar book or song," four out of five times on each of three consecutive days. An STO for that goal required "with verbal model, for at least 2 lines from 2 familiar songs or books." Another AG was that Student would perform music-motor activities consistently once weekly for one month, with an STO that during Inside Circle he would perform 75 percent of the body motions to five or more songs. A third AG was that Student would produce four-plus word utterances to communicate or do other expressive communication skills 80 percent of the time over a two-week period, with an STO of spontaneously producing three-to-five word sentences. Ex. D25 at 7-8.

In or about October 2016, Laura Starrett. M.D. referred Student for an Autism evaluation based on concerns with his/her communication, behavior, social skills, and motor skills. After evaluation, on or about October 20, 2016, Student was diagnosed with Autism Spectrum Disorder (ASD) by the Autism Clinic at Doernbecher Children's Hospital (Doernbecher) in Portland. As a component of ASD, Student can sometimes become emotionally dysregulated. In November 2016 the District's IFSP team met with Parents to review the Doernbecher report. The District decided not to conduct any other evaluations of Student at that time and advised Parents

to wait until Student was entering kindergarten. The ALJ found that the District's explanation of why the District chose to delay did not comport with the evidence, and the ALJ found Parents' version of the discussion more credible and consistent with the evidence.

On September 20, 2017, Parents and the District's IFSP team met to develop a new IFSP. This IFSP lessened Student's supports and accommodations and changed many of Student's AGs and STOs. The District, however, continued to state the AGs and STOs mostly in quantitative terms. This IFSP also included significant portions that were simply reproduced from the September 2016 IFSP.

On February 7, 2018, the District requested that Parents sign a prior consent form to have Student evaluated for ASD because Student would enter kindergarten the next year. Mother signed the form the same day. On February 14, 2018, the District noticed an IFSP meeting for the stated purpose of adding a behavior support plan (BSP) to Student's IFSP. The District did not conduct a functional behavior assessment (FBA). On February 16, 2018, the District created a Social Emotional Support Plan that it considered to be a BSP, and Mother signed the plan on February 22, 2018. The District stated that the BSP was needed to address behavior by Student, including "hitting, kicking, throwing objects in classroom (usually at teacher), pushing other kids, screaming, and throwing/knocking furniture over." On February 22, 2018, the District issued an amended IFSP.

In March 2018 the District noticed another IFSP meeting for Student. The District's Autism Consultant and Behavior Specialist, Haidee Copeland, Ph.D., evaluated Student and prepared an ASD Evaluation Report. Dr. Copeland's report did not mention Student's October autism diagnosis by Doernbecher. Student's scores related to his/her adaptive behaviors reflected that Student was below average, low, or extremely low in nearly all areas assessed. The report also concluded that Student experienced "significant difficulties in using language to

communicate." Dr. Copeland concluded that Student had areas of concern in all four areas assessed for ASD—communication, social communication, restricted and repetitive patterns of behavior, and sensory. Dr. Copeland's report signified that Student would benefit from interventions and accommodations. Dr. Copeland concluded that with adequate support, Student was able to attend a full day of school in a general education kindergarten classroom.

On April 4, 2018, Parents and the IFSP team met. They agreed that Student was eligible for special education services based on ASD and added it to Student's identification category. On May 1, 2018, Parents and an IEP team met to develop an IEP for Student and his/her transition to kindergarten. At this meeting, Student's Head Start teacher emphasized the importance of visual cues and clear and simple language for transitions from one activity to another with Student, and the importance of having a single adult contact for Student. Student's team also discussed the importance of routine for Student, such as being able to run and touch a certain rock at the end of recess.

The May 2018 IEP's statement of overall strengths, interests, and preferences was verbatim to that in Student's 2016 and 2017 IFSPs. The IEP also contained a statement purporting to address Student's present level of cognitive skills that was the same as Student's 2016 and 2017 IFSPs. Similarly, the statements about Student's adaptive functioning and Student's functional performance in social/emotion domain were identical to those statements from Student's 2015, 2016, and 2017 IFSPs. The District's statement on Student's present level gross motor skills in the May 2018 IEP was taken from Student's 2017 IFSP. Other present level statements were the same or similar to past IFSPs. The May 2018 IEP also contained AGs and STOs that were the same or similar to Student's past IFSPs.

The May 2018 IEP included specially designed instruction (SDI) that Student was to receive during his/her kindergarten year:

- Visual motor skills for 60 minutes per week;

- Communication skills for 40 minutes per week; and

- Behavior—social/emotional skills for 30 minutes per week.

The May 2018 IEP identified the related services Student would need to access his/her education as:

- Occupational therapy (OT) for 210 minutes per year;

- Physical therapy (PT) for 210 minutes per year;

- ASD services for 120 minutes per year; and

- Transportation to and from school each day.

The May 1, 2018 IEP also listed several supplementary aids, services, and accommodations the District would provide Student, and their frequency, including:

- Providing visuals and social stories and updated daily schedule; daily to support behavior and social goals;

- Providing warning, preparation, and reminders for change in routine; daily for routine changes;

- Using visual timers to help with transitions/ending activities; daily during activities that have a clear end time;

- Allowing built in choice during typical daily routines (e.g., sit on chair or carpet square);

- Using clear direct concise language, give clear expectations; when speaking to Student;

- Sensory Menu; throughout the day when Student is dysregulated;

- Adult supervision for all transitions; during transitions; and

- Instructional assistant (IA) who is trained in Crisis Prevention Intervention (CPI) when Student is in general education classroom; during beginning of school year, reassessed monthly.

The May 2018 IEP team considered and rejected keeping Student in the general education classroom between 40-70 percent or less than 40 percent of the school day. Instead,

the team decided to place Student in the general education classroom at least 80 percent of the school day with pull-out services provided as specified in the IEP. The May 2018 IEP had no BSP, even though one previously had been prepared for Student. Anne Cole, Program Coordinator for the District's Early Intervention/Early Childhood Special Education program, stated that she believed Student needed a BSP as of May 2018.

At the May 1, 2018 meeting, District personnel worried about Student attending what would be his usual kindergarten and proposed Westside Elementary (Westside) as a school with better ASD support. The District held a meeting later in May to discuss Student's placement location. Based on the District's representations about the specialized training of special education teacher Sandra Ferrick, the sensory room next to her classroom, and other ASD support at Westside, Parents agreed to send Student there.

Throughout the 2016-17 and 2017-18 school years, the District provided Parents with progress reports that discussed Student's progress mostly in general terms. The reports seldom contained quantitative information that matched the quantitative AGs and STOs. The reports also contained some confusing or conflicting information, such as describing in the narrative portion how Student was struggling to achieve a goal and concluding that the goal needed to be continued, but yet marking that the goal was met. The reports also often simply copied text verbatim from previous reports or failed to discuss Student's progress in certain areas.

### 2.  Kindergarten: 2018-19

For the 2018-19 school year, the District assigned Amalia Shaner as Student's general education kindergarten teacher at Westside. The morning of Student's first day, September 4, 2018, was fine, until after recess. Student was playing with Legos and refused to break away from that activity. Ms. Shaner stated that she would let him continue and would circle back to him. When she persisted in asking Student to transition, Student threw the tub of Legos across

the room. Ms. Shaner took Student to the sensory room next to Ms. Ferrick's classroom. Student

continued to become dysregulated and kicked Ms. Shaner. There was no IA assigned to support

Student that day. The Westside principal determined that Student's behavior was unsafe and

called Parents to immediately pick up Student. Parents reminded school employees of strategies

such as "bear hugs" to calm Student but the school insisted that Parents take Student home.

Student did not attend school the next day. The next morning Ms. Ferrick texted Parents

about a meeting to adjust Student's placement and Ms. Ferrick's belief that the school

psychologist should be present at the meeting. Parents responded with frustration, questioning

whether the District provided Student the necessary supports including visual transition aids for

activities, and that the District placed Student in a foreign environment with none of his/her Head

Start peers. Ms. Ferrick later texted that the school psychologist would not attend the meeting

and if Parents were not happy with Student's adjusted placement Parents would have to meet

with the psychologist.

Student's second day of kindergarten was September 6, 2018. Student hung his/her

backpack on a hook as Student had been taught in Head Start. Ms. Shaner preferred that students

use cubbies and insisted Student follow that routine. Student became upset at the disruption in

routine and kicked an IA. Ms. Shaner again removed Student to the sensory room. At around

midday, the Westside principal called Parents to immediately pick up Student. When Father

arrived, in the sensory room three adults were surrounding Student, holding mats in front of them

to form a triangular wall. Student was in the center, in a pseudo-fetal position, sobbing. Father

walked in and Student crawled in Father's lap. Father testified that Student appeared scared and

it appeared the adults had "cornered" Student "like a wild animal." Tr. Vol. 13, 2795:15-25.

On Friday, September 7, 2018, Student's third day, the bus did not pick up Student. The

bus barn reported that the District notified the bus barn not to pick up Student until further

notice. Parents drove Student to school. Upon arriving at Westside, the principal and Ms. Ferrick informed Parents that Student's school day was being shortened to four hours.

The District proposed another IEP meeting for Student. The District did not propose conducting an FBA of Student. The IEP meeting was split into three meetings over September 10-11, 2018. At the beginning of the first meeting, the District advised Parents that Student's school day was being shortened to two hours, in the sensory room with an IA. Parents advocated for different options but the District would not consider other options.

The draft IEP presented to Parents at the September 10, 2018 meeting was much like the May 2018 IEP, but contained a narrative paragraph about Student's first few days in kindergarten. This narrative contained factual inaccuracies. The September 2018 IEP also increased Student's SDI in the area of social/emotional skills from 60 minutes per week to 60 minutes per day and identified several new supplementary aids and services in the form of a BSP, a school safety plan, and a step-up plan. The District did not propose an FBA despite these significant concerns with Student's behavior. The step-up plan identified three phases required for Student's progress to have his/her school day increased and for him/her to return to the general education classroom.

On September 20, 2018, Father contacted Anne Carloss, Director of Special Education for the District, expressing Parent's frustration with the situation and noting that Parents had contacted Disability Rights Oregon about their legal rights. Ms. Carloss responded that she had asked that the District to conduct an FBA of Student. The FBA was conducted on October15, 2018, but it did not mention transitions or disruption to Student's routine as potential triggers of problem behavior. The District drafted a new BSP after the FBA, but the only change was it allowed Student to be a helper in Ms. Ferrick's classroom.

The District held step up meetings in September and early October and did not change Student's plan or increase his time in school. On October 15, 2018, the District held another IEP meeting. Parents expressed frustration at the lack of progress and Student's continued reduced hours and lack of general education placement. The District declined to make any changes.

The District held a step up meeting on October 22, 2018. Parents expressed concern that Student could never meet the step up requirements because Student was being isolated in the sensory room. Parents argued that Student needs peer modelling to learn classroom routines and socialization. The District made no changes.

The District continued to hold regular step up meetings. On November 3, 2018, the Westside principal reported that Student put scissors in an electrical socket in the sensory room. The principal acknowledged that the electrical sockets should be covered in that room and that Student should not have access to scissors. Despite this behavior, on November 5, 2018, the District increased Student's school day by 30 minutes. On December 13, 2018, the District increased Student's day by another 30 minutes. On January 7, 2019, the District increased Student's day by 30 minutes. This brought Student's total to 3.5 hours. Student was scheduled to be in Ms. Shaner's general classroom for this newly-added 30 minutes. Ms. Shaner did not receive any training on implementing Student's BSP in the classroom.

On January 22, 2019, Student engaged in physical aggression toward a peer who took a toy that Student wanted. Student also engaged in aggressive behavior toward an adult staff member who tried to intervene. The incident lasted approximately one minute. Also on that day, Student resisted returning to class after lunchtime recess. At that time, Student hit and kicked an adult staff member who tried to encourage him/her to return to class. The District placed Student in the sensory room. After approximately 15 minutes, Student calmed down but the District did

not allow Student to return to the general education class. Instead, Student remained in the sensory room for the rest of his/her school day.

On January 23 and 24 Student had behavioral incidents and the District requested that Parents intervene. On January 24, 2019, Father sent the Westside principal an email expressing concern that Student was experiencing renewed behavior outbursts with no triggers identified by the District. Father also informed the principal that Parents would be keeping Student home for a few days "until [the] team can present a plan that addresses the problems that [Student] is having as well as providing specific supports to help [him/her] succeed." The principal responded that the school would implement the IEP and BSP as currently written. Father responded that "obviously" the current plan was not working because Parents were being called every day. Father commented that something has changed or someone is implementing the plan differently, and he queried how would anything be different if Parents returned Student to school. Mother also contacted the District, commenting that Student was at school only 20 minutes when the school asked Parents to pick up Student, and that Student was being rewarded for acting out. Mother also queried what Westside is doing differently than all the other situations in which Student is much more successful. The principal responded that the school stands ready to implement the current IEP or hold an IEP meeting to discuss any changes to the IEP. Parents did not return Student to school with the District.

On March 8, 2019, the District held an IEP meeting. Dr. Copeland asked about Parents' concerns, and Father responded that Parents had already shared their concerns. The District gave Father a copy of a draft IEP, and Father asked for time so he could review it with Mother. The District did not explain to Father the changes to Student's IEP that were included in the March 2019 IEP. These included changing AGs and STOs despite no evidence that Student met

the previous goals, reducing or removing some supports, interventions, and accommodations, and increasing or adding a few supports, interventions, and accommodations.

## B. Procedural History

On March 20, 2019, Parents filed a Request for a Due Process Hearing (Due Process Complaint) with the ODOE on behalf of Student alleging the District violated federal and state statutes, federal regulations, and state administrative rules during the 2016-2017, 2017-2018, and 2018-2019 school years. Parents alleged these violations led to a denial of a FAPE to Student. The Due Process Complaint alleged many violations during the relevant period. The ODOE Office of Hearings assigned the case to Senior ALJ Joe L. Allen. The ALJ presided over an in-person hearing for 17 days, from November 18 through 22 and December 2 through 6, 2019, and January 24, 28, and 29, 2020 and February 10 through 12, and 19, 2020. Both parties were represented by counsel and the ALJ heard testimony from 17 witnesses.

On July 2, 2020, the ALJ issued a 163-page Final Order. The ALJ found that the District committed many procedural and substantive violations of the IDEA that caused a failure to provide Student with a FAPE throughout the entire period at issue. These violations included: (1) failing properly to identify and evaluate Student as a child with ASD during the 2016-17 school year, which failed to meet the District's "Child Find" obligations; (2) failing to provide progress reports that contained sufficient data that correlated to the quantitative goals and objectives set by the District and to timely provide other proper documentation so that Parents could monitor Student's progress, thereby denying Parents the opportunity meaningfully to participate in the development of Student's IFSP in the 2016-17 school year; (3) developing a deficient IFSP in September 2017 because the District (a) did not consider Student's ASD, (b) removed necessary services and supports without proper justification, (c) improperly adjusted Student's goals and objectives, and (d) failed to provide present-level data in a quantitative

manner after setting goals and objectives in a quantitative manner, thereby depriving Parents of a way to meaningfully participate in developing the IFSP; (4) failing to meet the District's obligations to identify and evaluate Student for ASD for at least eight months of the 2017-18 school year; (5) failing to conduct an FBA before drafting a BSP in February 2018; (6) providing deficient progress reports in the 2017-18 school year that were unclear, confusing, and failed to contain specific information so that Parents could monitor Student's progress, thereby denying Parents the opportunity meaningfully to participate in the development and evaluation of Student's IFSP; (7) providing Parents with an incomplete copy, only four pages, of the February 2018 amended IFSP; (8) developing a deficient IEP in May 2018 because the District (a) failed to provide Parents with quantitative present level data even though the District had framed Student's goals and objectives in quantitative terms, and including inaccurate present-level data that had simply been imported from previous years, (b) imported outdated goals and objectives rather than evaluate them based on current need, (c) failed to conduct an FBA, and (d) removed Student's BSP; (9) failing properly to implement the May 2018 IEP during the first week of the 2018-19 school year in September 2018; (10) holding IEP meetings on September 10 and 11, 2018 without the required District team members; (11) developing a deficient September 2018 IEP because it contained inaccurate present level information that was simply copied from the May 2018 IEP plus an inaccurate new narrative summary about Student's first week of school in September 2018; (12) predetermining Student's placement in school of only two hours per day in the sensory room in the September 2018 IEP, which deprived Parents of the opportunity to meaningfully participate in the development of the IEP; (13) failing to conduct an FBA before implementing the BSP in September 2018; (14) failing to place Student in the least restrictive environment (LRE) without proper justification, thereby denying FAPE for the entire academic year of 2018-19 even though Parents removed Student from the District's kindergarten program

in January 2019; and (15) developing a deficient IEP in March 2019 because the District failed to place Student in the LRE and made unilateral changes to and removals of Student's supports and accommodations, without supporting data. In reaching his conclusions, the ALJ repeatedly made credibility findings in which he accepted and gave more weight to the testimony and arguments of Parents over the testimony and arguments of the District, citing specific testimony and evidence supporting his conclusions.

In evaluating remedies, the ALJ concluded that although the District failed to provide Student a FAPE throughout the period at issue, the record did not clearly establish a compensable, or calculable, loss for the violations in the 2016-17 or 2017-18 school years. The ALJ found, however, that the record established a compensable period for the entire 2018-19 school year. To calculate the amount of compensatory education to award for the 2018-19 school year, the ALJ assumed 180 instruction days, at five hours per day, for 900 hours of compensatory education needed to put Student "in the same position [he/she] would have occupied but for the school district's violations of [the] IDEA." Final Order at 155 (alterations in original) (quoting *Antelope Valley*, 858 F.3d at 1201). The ALJ also ordered that the District conduct an FBA on Student and to convene an independently facilitated IEP meeting to draft an appropriate IEP, with SDI and related services.

On September 29, 2020, the District filed its complaint in this Court, appealing the ALJ's decision (Appeal). The District also moved for a temporary restraining order enjoining the ALJ's remedy award. The Court denied the District's motion for a temporary restraining order without prejudice. The parties filed their briefs on the merits of the Appeal in March and early April 2021. On April 29, 2021, the Court held a hearing on the Appeal.

**DISCUSSION**

**A. Burden of Proof**

At the administrative hearing, Parents, on behalf of Student, bore the burden of proof to show that the District committed violations that denied Student a FAPE. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005) (explaining that under the IDEA, the burden of persuasion in an administrative hearing challenging an IEP is placed upon the party seeking relief). On appeal before this Court, the District bears the burden of proof. *See Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1104 (9th Cir. 2007) ("The burden of proof in the district court rest[s] with . . . the party challenging the administrative decision.").

**B. Deference**

The parties dispute the level of deference that the Court should give to the ALJ's findings of fact and conclusions of law. A reviewing court should consider an Administrative Hearing Officer's findings "thorough and careful" when the hearing officer participates in the questioning of witnesses, includes a complete factual background, and provides a discrete analysis supporting the ultimate conclusions. *R.B.*, 496 F.3d at 942. The ALJ's 163-page Final Order contains 54 pages and 296 paragraphs of thorough and well supported factual findings. It also cites the appropriate legal standards and contains more than 80 pages of complete, well-reasoned, and thoughtful legal conclusions supported by cited facts and authority.

The District argues that the ALJ's decision is entitled to little deference because (1) it is internally inconsistent by providing remedies outside the scope of the relevant period; (2) the ALJ applied inapplicable legal standards; (3) the ALJ ignored controlling case law; and (4) the ALJ ignored relevant evidence and testimony.[3] Student argues for the higher level of deference

---

[3] The Court rejects the District's argument that because in one sentence the ALJ references Student's "special education teacher for fourth and fifth grade," the Final Order is not

accorded to thorough and careful findings. The Court addresses each argument by the District in turn.

### 1. The ALJ's Award of Compensatory Education

The Court rejects the District's first argument, that the ALJ's Final Order is internally inconsistent because the ALJ awarded compensatory education for the full 2018-19 academic year when the ALJ identified the relevant period as through March 20, 2019, the date Parents filed the Due Process Complaint. The ALJ repeatedly stated that the District's violations of the IDEA that occurred *before* March 20, 2019 precluded Student from receiving a FAPE throughout the entire 2018-19 school year. *See, e.g.*, Final Order at 123, 145, 155. The portions of the record cited by the District in support of its argument involve the ALJ excluding evidence of events that occurred *after* March 20, 2019. These include a new IEP meeting, evidence about Student's abilities to attend his new school in April 2019, and that Student enrolled in a new school in April 2019 and requested tuition reimbursement for that school. The challenged finding by the ALJ, however, was that the conduct of the District from before the filing of the Due Process Complaint (within the relevant period) caused a denial of FAPE for Student for the entire 2018-19 school year. The ALJ did not consider the conduct of the District or Student outside the relevant period in reaching this conclusion. Thus, the ALJ's opinion was not internally

---

careful and thorough. The District asserts that this reference could not be a typographical error because Student did not have the same teacher in two consecutive years at Head Start or between Head Start and kindergarten. For whatever reason this reference to fourth and fifth grade was inadvertently included in the Final Order, it does not show a lack of care or thoroughness in the ALJ's opinion. It is evident from a review of the opinion that the ALJ was well aware that Student was in Head Start and then kindergarten. A single passing reference to the fourth and fifth grade in 163 pages does not show otherwise, or support an overall lack of care or thoroughness. The District also makes other challenges to various other minor factual findings and conclusions. The Court does not find these arguments persuasive and, in the alternative, finds any error cited by the District to be immaterial.

inconsistent in awarding remedies through the end of the 2018-19 school year. The Court discusses the ALJ's authority to award compensatory education for the entire school year in Section C.8 below.

### 2. The ALJ's Application of OAR 581-015-2181

The District's second argument is that the ALJ's Final Order is not entitled to deference because the ALJ applied Oregon Administrative Rule (OAR) 581-015-2181 in analyzing the District's conduct preparing SBAs and FBAs. The District points out that the ODOE had not yet adopted OAR 581-015-2181 during the relevant period. The District also argues that even if the OAR were in effect, it is only triggered when the student, staff, or other students are at "imminent risk of serious bodily injury" as a result of the student's conduct. The District contends that requirement would not have been triggered under Student's circumstances. The Court rejects the latter argument. The District reported concerns about Student's hitting, biting, pushing, throwing objects at teachers, and kicking. District witnesses testified that they were concerned about the safety of Student and other students. Further, Student's kindergarten principal reported that Student put scissors in a light socket. There was sufficient record evidence of imminent risk of serious bodily injury to Student and others.

As for the District's argument about OAR 581-015-2181, Student responds that although the state agency had not yet adopted the regulation, the legislature had passed the relevant statute in 2017, with an effective date of July 1, 2018, so the District should have known about its requirements. The District replies that the ALJ did not cite the statute, and that the Due Process Complaint did not cite the statute or the regulation, so the District was not on notice to defend under either. Regardless of whether the District should have known about the substantive requirements or was on notice to defend substantively about the requirement to conduct an FBA, the Court does not find the fact that OAR 581-015-2181 was not yet in effect to be a material

error that renders the ALJ's entire Final Order deserving of less deference.[4] *See J.B. ex rel.*
*Billiet v. Tuolumne Cnty. Superintendent of Sch.*, 2021 WL 1221468, at *8 (E.D. Cal. Mar. 31,
2021) (adopting the magistrate judge's conclusion that "overall, the ALJ's ruling was thorough
and careful" even though the opinion "failed to delve into certain issues" and even though the
court did not fully adopt the ALJ's conclusions). Overall, the ALJ's 163-page opinion is careful
and thoughtful and deserving of deference.

### 3. The ALJ's Treatment of the District's Cited Case Law

The District's third argument is that the Court should not give the ALJ's opinion
deference because the ALJ "ignored" case law that was on point. The District asserts that it cited
case law to the ALJ that holds that schools are not required to include baseline data in special
education documents, and the ALJ failed to distinguish those cases. The ALJ, however,
repeatedly noted the District's argument on this point, and the ALJ responded to this argument.
The ALJ explained that because the District chose to set specific, numeric, quantifiable goals, the
District had to provide information in the progress reports and subsequent IFSPs and IEPs that
would meaningfully allow Parents to evaluate whether those quantifiable goals were being met
or whether progress was being made toward those quantifiable goals. Thus, although the ALJ did
not specifically discuss the cases cited by the District, the ALJ addressed the District's argument.

The ALJ repeatedly cited the legal requirement that an IEP must include, among other
things, "a statement of measurable annual goals, including academic and functional goals . . .
designed to (A) meet the child's needs that result from the child's disability to enable the child to
be involved in and make progress in the general education curriculum; and . . . (B) Meet each of

---

[4] The District disputes this issue in challenging the deference the Court should give to the
ALJ's opinion, but does not raise this as a reversible error by the ALJ. Thus, it is not discussed in
this Opinion and Order.

the child's other educational needs that result from the child's disability." OAR 581-015-2200(1)(b). The IEP also must include "a description of how the child's progress toward meeting the annual goals will be measured and when periodic reports on the progress the child is making toward meeting the annual goals . . . will be provided." OAR 581-015-2200(1)(c). The ALJ also cited the U.S. DOE's guidance document, *Questions and Answers (Q&A) on U.S. Supreme Court Case Decision Endrew F. v. Douglas County School District Re-1* (Dec. 7, 2017). This document explains: "The expectations of progress in the IEP must be appropriate in light of the child's unique circumstances" and that IEP team members "must give 'careful consideration to the child's present levels of achievement, disability, and potential for growth.'" *Id.* at 6. This guidance also emphasizes that the "IEP must include, among other information, an accurate statement of the child's present levels of academic achievement and functional performance and measurable annual goals, including academic and functional goals." *Id.*

The ALJ's opinion is not entitled to less deference for concluding that because the District set Student's measurable goals in quantitative terms and provided the description of how to measure progress toward meeting those goals in quantitative terms, the District created its own burden to provide that quantitative information. The District may not have been required to do so under the IDEA, but it voluntarily chose to do so.

Additionally, the cases cited by the District are distinguishable.[5] The District quoted *Student v. Silver Falls School District*, DP 13-113 at 37, in which the ALJ held that "an IEP" does not require "baseline data linked to the goals and objectives" but only "a statement of the child's present levels of educational performance." The District also quoted *Ashland School*

---

[5] In its briefing before this Court, the District cites its Closing Brief before the ALJ and the cases cited therein.

*District v. Parents of Student R.J.*, which similarly held that an IEP need not make "each objective numerically quantifiable and then furnish numerical progress reports," while concluding that the school "quantified that which is readily capable of being quantified . . . there is no easy way to quantify goals such as having the right friends or making good decisions." 585 F. Supp. 2d 1208, 1229 (D. Or. 2010). The District additionally cited *West-Linn Wilsonville School District v. Student* (*West-Linn*), which quoted *Ashland* in discussing the validity of the baseline data and goals in the underlying IEPs. 2014 WL 3778571, at *13 (D. Or. July 30, 2014). The District cited two other cases holding that the IDEA does not mandate that IEPs set specific numerical data and courts should not "compel a school district to put more in its IEPs than is required by law." *Lathrop R-11 Sch. Dist. v. Gray*, 611 F.3d 419, 423-24 (8th Cir. 2010); *see also Red Clay Consol. Sch. Dist. v. T.S.*, 893 F. Supp. 2d 643, 650-51 (D. Del. 2012).

All the cases cited by the District relate to whether an IEP must establish numerical AGs and STOs and include specific numerical baseline data. As the ALJ discussed, however, this case is about how progress must be reported when the District *chooses* to set numerical, specific goals and objectives in an IFSP or IEP. The District did not address that argument before the ALJ. Additionally, Student's AGs and STOs *were* quantifiable. In other words, the District did not "quantify that which is readily capable of being quantified." *Ashland*, 585 F. Supp. 2d at 1229. The cases cited by the District are distinguishable. Thus, any error by the ALJ in not specifically addressing them is immaterial.

### 4. The ALJ's Assessment of Evidence and Testimony

The District's final argument is that the ALJ ignored some testimony and evidence and therefore presented an incomplete record. The District essentially disagrees with the ALJ's credibility determinations and argues that the ALJ did not specifically cite all the testimony of District witnesses in making the ALJ's credibility determinations. The Court has reviewed the

record and finds that the ALJ, as politely as possible, made his credibility determinations and cited specific evidence in the record supporting his conclusions. The ALJ cannot be expected to cite every piece of testimony in a 17-day hearing. The Court does not find the District's argument persuasive.

The ALJ explained his legal conclusions thoroughly, cited the relevant facts, and discussed applicable law. He was actively involved in the proceedings over the 17 days of the hearings. The ALJ's decision was thorough and careful and is entitled to considerable deference.

## C.  Analysis

The District argues that the ALJ made nine errors: (1) finding that the District failed its obligation to identify and evaluate Student for ASD in 2016-17 and 2017-18; (2) concluding that Parents could not meaningfully participate during the 2016-17, 2017-18, and 2018-19 school years by failing to provide adequate progress reports; (3) concluding that the IFSP for the 2017-18 school year failed to provide Student a FAPE; (4) overlooking Student's changed circumstances over the 2018 summer, before kindergarten; (5) concluding that the May 2018 IEP was procedurally deficient and that it was not implemented in the 2018-19 school year; (6) concluding that the District failed to offer placement in the LRE during the 2018-19 school year; (7) concluding that the District failed to offer a reasonable IEP in March 2019; (8) calculating and awarding a compensatory education award that disregarded the scope of the hearing and Student's individual circumstances; and (9) ordering the District to conduct an FBA. The Court addresses each argument in turn.

1. **Whether the ALJ Erred in Concluding that the District Failed to Provide Student with a FAPE**

   a. **The District's Obligation to Identify and Evaluate Student for ASD**

The District argues that the ALJ erred in concluding that the District denied Student a FAPE by failing in the District's obligations to identify and evaluate Student for ASD in the 2016-17 school year and nine months of the 2017-18 school year. The District asserts that the ALJ ignored testimony by District witnesses in reaching this conclusion. The Court disagrees.

First, the District argues that the ALJ ignored Ms. Cole's testimony in finding that Parents did not voluntarily decide to delay Student's ASD assessment and instead were discouraged by District personnel. The ALJ explained:

> At [the] hearing, the District presented testimony from Ms. Cole that the team, including Parents, elected to hold off on conducting evaluations of Student for eligibility under the ASD category due to complications with Student's vision and recovery from hip surgery. By contrast, Parents testified that, when they presented Student's diagnostic evaluation to the District's IFSP team members and requested an ASD evaluation, the District discouraged them from pursuing the ASD evaluation by indicating, if found eligible under ASD, services for Student would change and that such changes might not be best for Student. I am persuaded that Parents' testimony is more consistent with the persuasive weight of the evidence in this matter.

Final Order at 85 (citation omitted). The ALJ continued, describing that Student participated in Doernbecher's evaluation without an eye patch and without difficulty. The ALJ also noted that Student's hip surgery was in June 2017, months after this November 2016 discussion between the District and Parents. The ALJ further noted that his review of the records showed that Student was mobile and did not experience any access issues during his 2016 evaluation at Doernbecher. Thus, the ALJ did not ignore Ms. Cole's asserted reasons for delaying the ASD evaluation, but found them not credible.

The District argues that the ALJ erred in not citing Ms. Cole's rebuttal testimony, where Ms. Cole denied telling Father that an ASD evaluation might cause things to change for Student and "not necessarily for the better." The ALJ, however, does not have to recite every piece of testimony in a credibility finding and specifically state every sentence that the ALJ finds less credible. The ALJ politely stated that he found Parents' testimony more credible. The ALJ gave a few specific examples of the medical reasons Ms. Cole provided for why she felt the delay was warranted and why those reasons were not credible based on the evidence. That was more than sufficient. The ALJ did not also need to state that he found Ms. Cole's denial of making another statement incredible. The ALJ did not err in his credibility determinations, particularly given the level of deference this Court gives the ALJ in such findings. *See Ms. S.*, 337 F.3d at 1127; *Amanda J.*, 267 F.3d at 889.

The District next argues that the ALJ ignored District expert testimony in finding no evidence in the record that Student's eligibility under ASD would have been different in March 2017 versus April 2018. The District contends that Ms. Cole testified about the effect of Student's hip surgery and eye patch and vision problems, and that delaying until after those medical issues were resolved was better for Student. The ALJ, however, specifically addressed Ms. Cole's purported medical reasons for why she believed the ASD assessment delay was necessary and explained why he found those reasons not credible. *See* Final Order at 85. The ALJ did not need to address this issue a second time in this portion of the opinion.

Finally, the District argues that the ALJ ignored documentary evidence in concluding that the District's procedural failure to evaluate Student for ASD resulted in substantive harm to Student. The District asserts that simply by comparing the February 2018 IFSP to the May 2018 IEP, the ALJ would have seen that after conducting the ASD evaluation the District's plan for Student contained similar interventions and support. The Court disagrees with this view of the

two plans. The May 2018 IEP added many specific interventions, accommodations, and support for ASD. Further, the ALJ found both the February 2018 IFSP and the May 2018 IEP deficient, so even if they were much like one another, the District's argument would be unpersuasive.

The Court rejects the District's assertions of error. The ALJ applied the correct legal standards and explored the facts in concluding that the District's failure to identify and evaluate Student for ASD in the 2016-17 and 2017-18 school years caused a procedural violation of the IDEA and denial of FAPE. The Court does not find any reversible error by the ALJ in reaching this conclusion.

### b. Progress Reports

The District argues that the ALJ erred in concluding that the District did not provide sufficient information to Parents in the progress reports for Parents to meaningfully participate in the development and evaluation of Student's IFSPs and IEPs. The District frames the ALJ's conclusion solely as one based on the progress reports' lack of "exact percentages" in "baseline data."

The ALJ found that the progress reports were deficient because the District set quantitative AGs and STOs but then did not provide enough information from which Parents could assess whether Student was progressing toward those quantitative goals. The ALJ tied the requirement of quantitative information in the progress reports to the District's decision to set quantitative goals and objectives. The ALJ made additional findings, however, about why the progress reports were deficient. The ALJ described how the progress reports were inaccurate, internally inconsistent, confusing, and unclear. *See, e.g.*, Final Order at 89, 106-10. The District does not address these other findings. The Court can affirm the ALJ's finding on this basis alone. The District's arguments against the ALJ's finding relating to quantitative baseline data, however, are not persuasive, as discussed next.

The District first argues that the ALJ ignored binding case law holding that the District need not provide quantitative data. As discussed above, those cases are distinguishable. Nor did the ALJ err in finding that the District had to provide sufficient baseline information for Parents meaningfully to participate. As explained by U.S. Magistrate Judge Janice Stewart,

> Under Oregon law, IEPs must include: "A statement of the child's present levels of academic achievement and functional performance, including how the child's disability affects the child's involvement and progress in the general education curriculum." OAR 581-015-2200(1)(a). The purpose of present levels "is to establish a baseline relative to which the teaching staff and IEP team may determine goals and objectives and against which they measure student progress." *Sheridan Sch. Dist.*, 04-054-011, 109 LRP 65849, at *8 (OSEA June 14, 2004). Present levels must be stated in specific terms in order to "inform a revision of the IEP." *Id.* at *8-10. Present levels provide a roadmap to further integration, "so that approaches for ensuring the child's involvement and progress in the general curriculum . . . can be identified." *Id.* at *9 (citation omitted).

*West-Linn*, 2014 WL 3778571, at *14; *accord Anchorage Sch. Dist. v. D.S.*, 688 F. Supp. 2d 883, 889 (D. Alaska 2009) (finding no reversible error in ALJ's conclusion that an IEP denied FAPE when it contained "vague Goals and Objectives without baselines or methods to objectively measure progress"); *Dallas Sch. Dist.*, DP 09-129, 111 LRP 37009, at *49 (OSEA June 16, 2010)[6] ("The April 2008 PLOP [Present Level of Academic Achievement and Functional Performance] contained information about Student's expulsion and how that was being addressed. It lacked sufficient baseline data on Student's current achievement or functional performance against which expectations and future performance could be measured. Parents have established that the District failed to comply with OAR 581-015-2200(1)(a)."); *id.* at *53 ("However, the failure to have assessments and baseline dat[a] meant Parents could not

---

[6] *Available at* https://www.ode.state.or.us/wma/services/disputeresolution/dueprocess/2009orders/dp-09-129.pdf (last visited July 1, 2021); *also available at* ECF 42-1.

meaningfully participate had they attended, nor could the members who did go to the meeting. The District's failure to have complied with OAR 581-015-2200, including it[s] failure to have adequate PLOPs or current assessments for the April 11, 2008 IEP, were not de minimis. The failure to have current assessments and baseline data on Student's current achievement or functional performance go to the very core of an IEP and were a denial of FAPE."); *id.* at *44 ("Due to the lack of current assessments and baseline data on Student's current achievement or functional performance, the April 2008 IEP was unable to provide teachers with a way to determine if Student was making any progress.").

The ALJ found that the District's progress reports, because they were inconsistent, inaccurate, confusing, and did not include quantitative data that corresponded with the quantitative goals and objectives, failed to provide Parents with measurable data sufficient to evaluate Student's progress. The District triggered the need for quantitative data in these reports by the IFSPs and IEPs setting specific, quantitative AGs and STOs that were "readily capable of being quantified." *Ashland*, 585 F. Supp. 2d at 1229.

The District's next argument is that the ALJ ignored Parents' testimony that when the progress reports were issued, Parents did not believe the reports lacked sufficient information. Parents did not contemporaneously complain to the District that the reports were insufficient. The District argues that Parents understood the progress reports when they were issued, and the argument that the progress reports were insufficient stemmed from Parents' later-acquired understanding in litigation that the reports needed quantitative information. Father testified that at the time, Parents "thought [they] understood" that Student's teachers and therapist wrote that Student was "making progress." Tr. Vol. 14, 3105:21-26, 3106:1.

Parents testified that they were overwhelmed by the IFSP and IEP process. Parents thus trusted and relied on District staff to reassure Parents in what areas Student was making progress.

Parents' ignorance about the District's obligations in reporting do not negate the District's procedural violations. The ALJ did not err in applying the law and considering the evidence, including testimony by District employees that "if the parent reads the goal and the progress, they can infer where their child is."[7] Tr. Vol. 10, 2025:2.

The District also argues that the ALJ properly did not consider the District's argument that the progress reports were not the only source of information Parents received about Student's condition. The District argues that in the 2018-19 school year, Parents and the District were meeting regularly. The ALJ provided a long opinion that described these meetings in detail. There is no indication that the ALJ considered these meetings substantively better than the written progress reports. For example, the ALJ described the October 8, 2018 meeting as one in which Parents expressed frustration and the District refused to consider other options. Final Order at 46. The November 5, 2018 meeting was characterized as one in which, despite the principal having just reported a significant behavioral issue a few days earlier, the District increased Student's time in school by 30 minutes. Final Order at 47-48. The Court does not find any reversible error in the ALJ's findings and conclusions about the District's progress reports.

### c.  2017-18 IFSP

The District argues that the ALJ misapplied the "snapshot" rule by disregarding the fact that Parents did not object to the reduction in services in the September 2017 IFSP. The District states that it is not arguing that a parent who does not contemporaneously object cannot later challenge an IFSP or IEP, but merely that the lack of objection is "relevant." It is unclear what

---

[7] The District contends that the ALJ mischaracterizes District employees' testimony because District employees' testimony shows that Parents would only have to "infer" Student's progress in narrow circumstances. The Court has reviewed the transcript and finds no reversible error in the ALJ's assessment.

relevance the District is arguing Parents' lack of objection should have on review of the ALJ's determination that the 2017 IFSP violated the IDEA, if not to serve as a waiver or bar. Otherwise, any error would be immaterial. The Court declines to adopt such a position, and the District's cited authority does not support such a sweeping proposition.

The District cites *West-Linn*, arguing that had Parents objected at the time "the District might have changed its approach." *West-Linn*, 2014 WL 3778571 at *14. In *West-Linn* the court found that the IEP meetings did not violate the IDEA. *Id.* Only then did the court discuss that "moreover" there was no evidence that the parents had objected. *Id.* The District also cites *T.G. ex rel. T.G. v. Midland School District 7*, 848 F. Supp. 2d 902 (C.D. Ill. Jan. 27, 2012). In that case the court analyzed the IEP and rejected the parent's challenge on the merits. *T.G.*, 848 F. Supp. 2d at 917. The court next discussed that "moreover" the parents were heavily involved in the IEP process and did not object to the IEP. *Id.* Neither case holds that an IEP that *fails* under the IDEA cannot be challenged when the parents had not contemporaneously objected. Such a holding is contrary to the IDEA, which places the burden on the district, and not on the parents, to ensure a FAPE.

The District also argues that in finding that the 2017 IFSP was not designed to confer a meaningful benefit, the ALJ ignored evidence that the 2017 plan did confer a meaningful benefit because Student made progress by May 2018. The ALJ, however, identified the conflicting evidence in the record about Student's progress. The ALJ also identified that a significant problem with the September 2017 IFSP was that the District failed to evaluate Student for ASD before completing the IFSP, and identified the material harm caused by that failure. Finally, any error by the ALJ is harmless because the ALJ did not award any remedy for this violation.

### d. 2018 Summer

The District argues that the ALJ "blamed" Student's poor start in kindergarten on the District's lack of preparation to handle Student's unique needs and erred by ignoring documentary evidence that Student's behavioral issues escalated over the summer of 2018.[8] The District's characterization of the ALJ's findings and conclusions is simplistic and incomplete. The ALJ repeatedly discussed how during Student's first days in kindergarten the District failed to implement the interventions, accommodations, and services the District had put in place in the May 2018 IEP. Thus, much of the ALJ's finding is that the District had prepared for Student, but did not follow its own plan and preparation. Whatever Student's emotional state in September 2018 and whatever its "cause," the District did not implement the May 2018 IEP. Thus, even if Student had an escalation over the summer of 2018, it does not detract from the ALJ's numerous findings that the District failed to follow the May 2018 IEP or provide Student a FAPE in those first several days. The District remained under its obligation to provide Student a FAPE. The Court does not find that the ALJ erred in this regard, and if he did, any error was immaterial.

### e. May 2018 IEP

The District argues that the ALJ erred in finding the May 2018 IEP deficient for failing to have sufficient baseline information and for simply carrying over previous goals rather than assess Student as of May 2018. For the reasons discussed above, the Court rejects these assertions of error. *See, e.g.*, *Anchorage Sch. Dist. v. D.K.*, 2009 WL 5908720, at *8 (D. Alaska Oct. 30, 2009) (affirming ALJ's decision finding denial of FAPE where, among other problems,

---

[8] The documents cited by the District state that Student engaged in behavior such as hitting, kicking, throwing things, and property destruction. This is all conduct reported by the District during the 2017-18 school year.

goals were "simply new iterations of the previous goals" and there were "no reliable objective measures of progress" toward those goals).

The District next argues that the ALJ erred in finding that the IEP was deficient because the District failed to conduct an FBA. The District argues that "the record was devoid of evidence" that Student posed an imminent threat of danger to himself or others. The February 22, 2018 Social Emotional Support Plan/BSP, however, identified Student's concerning behaviors as "hitting, kicking, throwing objects in classroom (usually at teacher), pushing other kids, screaming, and throwing/knocking furniture over." Father also testified that at the May 1, 2018 IEP meeting, Parents raised concerns over Student's aggressive behavior. Student's Head Start teacher also conveyed to the IEP team her experiences with Student's aggressive behaviors upon dysregulation, including hitting and kicking adults. The District also added the Social Emotional Support Plan/BSP to Student's IFSP in February 2018, showing that the District was aware of and concerned about Student's behavioral issues. Because the record is replete with evidence of danger to Student and others the Court rejects the District's argument.

The District also argues that the ALJ erred in concluding that the District did not implement the May 2018 IEP in Student's first few days of kindergarten. The District's motion focuses only on the ALJ's finding on whether Student had an IA.[9] In response, Student noted that several other failures found by the ALJ. The District responded by challenging a few of those alleged failures, and arguing that the rest were not material.

_____

[9] The District argues that the May 2018 IEP did not require an IA for Student. The May 2018 IEP, however, provides that Student will have an IA "when in gen ed classroom who is trained in CPI" and the frequency of this accommodation is listed as "during the beginning of school year, reassessed monthly." The May 2018 IEP also requires that Student will have "adult supervision for all transitions." Both of these supplementary services have a start date of September 4, 2018.

The ALJ found that although "visual communication aids and advanced notice of upcoming transitions was clearly identified as a necessary support in Student's May 2018 IEP," when Student refused to transition on the first day, "Ms. Shaner simply allowed him/her to go back to playing with Legos and indicated she would come back to Student later." Final Order at 119. The ALJ questioned whether Student would even hear Ms. Shaner at such a time, when Student's attention was focused on a preferred activity. The ALJ also concluded that Ms. Shaner failed to provide Student with the "required visual calendar and timer supports when transitioning Student to a new activity." *Id.* The ALJ next discussed that the May 2018 IEP team concluded that Student needed one-to-one adult supervision at the beginning of the school year yet the District provided no IA for Student on his first day. The ALJ identified the many of ways a dedicated IA could have helped Student. The ALJ also described the District's failure to provide a sensory menu for Student, which precluded Ms. Shaner from offering Student options other than the sensory room. *Id.* at 120. The ALJ also noted Ms. Shaner's failure to keep to Student's routine of hanging his backpack, despite the District knowing the importance of routine to Student. Ms. Shaner instead forced Student to comply with Ms. Shaner's preferred routine. The ALJ summarized his conclusions:

> Again, the record is devoid of any evidence indicating that, before deciding to eject Student from the general education classroom, Ms. Shaner attempted to provide Student with any supports identified in the May 2018 IEP to assist Student with emotional or behavior regulation. Student was offered no visual supports or advanced notice of a change in his/her routine. Additionally, because Ms. Bertram had not developed the required sensory menu identified in Student's May 2018 IEP, Ms. Shaner was unable to provide any self-stimulation tools that might have assisted Student in regulating his/her emotional state. Moreover, had Ms. Rae or another dedicated IA been available to Student on the morning of September 6, 2018, he or she would presumably been able to assist Student with his/her transition into the classroom. More likely than not, that individual, properly trained to address Student's unique needs, would have been able to ease Student into the change in

> his/her routine or at least would have been able to identify the
> change as a likely behavior trigger and respond to Student's
> escalation accordingly.

*Id.* at 121.

The Court does not find any reversible error by the ALJ in considering the District's

implementation of the May 2018 IEP. The Court finds unpersuasive the District's argument that

Ms. Shaner's leaving Student to play with Legos and come back later complied with the

May 2018 IEP's transition requirement. The Court also agrees with the ALJ that these violations

were material. They more likely than not contributed to Student's removal from the general

education classroom in those first few days and inability to be calmed. Those days set Student up

for failure for the first part of the 2018-19 school year.

### f. 2018-19 LRE

The District argues that the ALJ applied the incorrect "burden of proof" and held the

District to an "arbitrarily high standard" in noting that the District had to justify placing Student

in a more restrictive educational placement instead of the LRE. The Court does not read the

ALJ's opinion as shifting the burden of proof or changing the standard on which the ALJ

evaluated this claim. The statement reflects the ALJ's understanding that the District needed

some reason or justification for placing Student in a more restrictive environment. *See D.M. v.*

*Seattle Sch. Dist.*, 2016 WL 4721802, at *20 (W.D. Wash. Sept. 9, 2016) (noting that a court

must "consider whether a school district appropriately placed a child outside of a regular

classroom setting"). This is because the IDEA provides:

> To the maximum extent appropriate, children with disabilities,
> including children in public or private institutions or other care
> facilities, are educated with children who are not disabled, and
> special classes, separate schooling, or other removal of children
> with disabilities from the regular educational environment occurs
> only when the nature or severity of the disability of a child is such

> that education in regular classes with the use of supplementary aids
> and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.114(a)(2)(ii); WAC 392-172A-02050; *see also* 34 C.F.R. § 300.116(a)(2). This "sets forth Congress's preference for educating children with disabilities in regular classrooms with their peers." *Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H. by & Through Holland*, 14 F.3d 1398, 1403 (9th Cir. 1994). The ALJ reviewed this claim under the four-part test established by the Ninth Circuit. *Id.* at 1404. Thus, the ALJ did not hold the District to an arbitrary standard.

The District also argues that the ALJ ignored facts in the record in concluding that the District improperly placed Student in a more restrictive environment. The District argues that the ALJ ignored expert testimony about Student's "stamina" and other limitations. The ALJ, however, discounted the District's argument and testimony on Student's "stamina" and inability to attend more than two hours of education. *See, e.g.*, Final Order at 123, 132, 138-39. The District further argues that the ALJ improperly concluded that based on Student's performance in Head Start, Student could perform in kindergarten. *The District*, however, evaluated Student at the end of his term at Head Start, and concluded that Student could perform in kindergarten with the appropriate support. The ALJ acknowledged the differences between Head Start and kindergarten. *See, e.g.*, Final Order at 144 ("There is no doubt from the record that the kindergarten environment at Westside differed significantly from that at Head Start."). The ALJ, however, found that the District could not craft a plan to support Student in the transition to kindergarten, not implement the plan's supports, services, and accommodations, and then unilaterally decide that Student could not be placed in general education without ever trying those supports, services, and accommodations the District had concluded would enable Student to attend kindergarten in the general education classroom.

The Court finds no reversible error by the ALJ. The evidence supports that the District failed to implement the May 2018 IEP in September 2018, failed to attempt the May 2018 IEP's proscribed interventions, accommodations, and supports, and refused to consider any options other than a two-hour school day in the sensory room. This does not comply with the District's obligations under the IDEA and denied Student a FAPE.

### g. March 2019 IEP

The District argues that the ALJ erred in concluding that the March 2019 IEP was deficient because the ALJ ignored the fact that Father did not object to the March 2019 IEP. The Court has already rejected the District's argument that a parent must contemporaneously object to an IEP to preserve rights to challenge the IEP.

### h. Conclusion

The Court has considered the ALJ's Final Order and the alleged errors argued by the District. The Court does not find reversible error by the ALJ and agrees that the District's conduct resulted in procedural and substantive violations of the IDEA that resulted in a denial of FAPE for Student.

## 2. Whether the ALJ Erred in Awarding Remedies

### a. Compensatory Education Award

The District argues that the ALJ erred by awarding compensatory education outside the scope of the hearing, without regard to the unique circumstances of Student, and without regard to testimony in the record. "Compensatory education is an equitable remedy that seeks to make up for educational services the child should have received in the first place, and aims to place disabled children in the same position they would have occupied but for the school district's violations of IDEA." *R.P. ex rel. C.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1125 (9th Cir. 2011) (simplified). The ALJ concluded that "the District denied Student a FAPE and must

provide compensatory education to 'place [the student] in the same position [he/she] would have occupied but for the school district's violations of [the] IDEA.' Student is entitled to compensatory education to make up for the denial of FAPE the entirety of the 2018-2019 school year." Final Order at 155 (citation omitted) (alterations in original) (quoting *Antelope Valley*, 858 F.3d at 1201). The Court reviews the ALJ's award of compensatory education for abuse of discretion. *Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1033 (9th Cir. 2006).

The ALJ found that the District's procedural and substantive violations of the IDEA during the period at issue resulted in Student being denied FAPE for the entire 2018-19 school year. In determining how much compensatory education would place Student in the same position he/she would have occupied but for the District's violations during the period at issue, the ALJ roughly calculated the number of kindergarten hours in the 2018-19 school year. The ALJ assumed 180 instruction days at five hours per day as the total compensatory education award. The ALJ then considered Student's IEP and awarded the same level of specific SDI and related services in OT, PT, and ASD as a subset of that total award. The ALJ ordered that the compensatory education be given before the beginning of the 2021-22 school year, distributed "appropriately" across all calendar months, including the summer.

The District first argues that the ALJ should not have included any instruction hours after March 20, 2019, when Parents filed the Due Process Complaint, in roughly calculating how much compensatory education to award, because that time is outside the period at issue. The Court rejects this argument. As discussed above, the ALJ only considered the District's conduct and violations from before March 20, 2019. The ALJ concluded, however, that those violations led to Student being denied a FAPE for the entirety of the school year. Courts and hearings officers have broad discretion in awarding compensatory education for past denials of FAPE. *See, e.g.*, *J.B.*, 2021 WL 1221468, at *12; *J.B. ex rel. Billiet v. Tuolumne Cnty. Superintendent of*

*Sch.*, 2020 WL 3287365, at *13 (E.D. Cal. June 18, 2020), *report and recommendation adopted in part, rejected in part*, 2021 WL 1221468 (E.D. Cal. Mar. 31, 2021) (affirming ALJ's award of daily fees for tuition, services, and room and board through 2019-20 school year when the due process complaint was filed in January 2019, and then adding remedy of one additional year to include 2020-21 school year). The ALJ did not abuse his discretion in awarding compensatory education equal to roughly a complete year of kindergarten.

The District argues that Student conceded and the ALJ found that harm after March 20, 2019 is not compensable, in discussing an IEP meeting that took place after March 20, 2019. The ALJ stated: "I think within the context of an IEP meeting occurring after the allegations contained in the due process complaint, if I accept those allegations or those facts as continuing violations, how does the District prepare and defend for a hearing today? The last allegation that they had from the parents ended March 30, 2019." Counsel for Student responded: "Understood. And you can't make future claims so—" The ALJ continued: "I think that if there is an ongoing violation, it will be the subject of a second due process complaint picking up March 21, 2019. On that basis, to the extent that S250 through 257 address an IEP meeting that occurred after the filing of the due process complaint, I would agree that they are irrelevant to these proceedings, and I would exclude them on that basis." Tr. Vol. 1 at 25:19-26:10.

The Court does not read this exchange as foreclosing the ALJ's discretion to award compensatory education for conduct that occurred *before* March 20, 2019. The ALJ merely excluded evidence of an IEP meeting that occurred *after* March 20, 2019, noting that Student must raise any claim for such a meeting in a second due process complaint. The "continuing violation" and "ongoing violation" references were to that IEP meeting—out-of-period conduct that Parents alleged constituted ongoing violations of the same nature as the conduct that

occurred during the relevant period. The Court does not interpret that reference to mean *harm* suffered from the conduct of the District within the relevant period.[10]

The District also argues that the proper approach is for Student to file a second due process complaint alleging harm after March 21, 2019. As discussed above, the Court disagrees that this is the only option for Student. Student, however, in an abundance of caution, has now done so. The District now argues that Student will get a double recovery. At oral argument, counsel for Student stated that this claim was filed to preserve Student's rights if the Court agrees with the District that the ALJ erred in calculating compensatory education for violative conduct before March 20, 2019, by including hours after March 20, 2019. Counsel represented that Student would withdraw this claim if the ALJ's decision is upheld and thus there is no danger of double recovery. The Court accepts this representation by counsel.

The District next argues that the ALJ abused his discretion because the Ninth Circuit allows courts and hearing officers the discretion to apply a fact-specific analysis and not simply apply a rote mathematical equation. *Parents of Student W. v. Puyallup Sch. Dist. No. 3*, 31 F.3d 1489, 1497 (9th Cir. 1994). The Court, however, does not read *Puyallup* to stand for the opposite proposition—the District's argument—that the ALJ does *not* have discretion to calculate compensatory education by roughly calculating a complete year of lost education when the ALJ finds that a complete year has been denied.

The District also argues that the ALJ's award of 900 hours of compensatory education ignored testimony from District staff and even Parents' expert that Student would not have been able to attend school at that level. The District additionally argues that because counsel for

---

[10] Notably, Parents assert that there was no IEP prepared at that meeting and that Student's last IEP with the District is the IEP at issue in this case.

Student represented to this Court on December 20, 2020 that 10 hours per week of compensatory education on top of the instruction Student was then-currently receiving in school was sufficient for the next few months, that is the amount per week of compensatory education the ALJ should have awarded for what Student was denied in the 2018-19 school year.

The Court rejects the argument that the amount of compensatory education Student requested per week in December 2020 equates to the amount of compensatory education the ALJ had to award for the District's denial of FAPE in the school year 2018-19. The ALJ calculated how much compensatory education would put Student in same position he/she would have been in but for the District's violation. The ALJ also ordered the District to distribute the awarded compensatory education "appropriately," including over the summer months, when Student is more likely to be able to engage in more hours. The ALJ also provided that the ordered schedule for delivering the compensatory education could be extended, with Parents' agreement.

The Court also does not find that the ALJ overlooked Student's unique circumstances. The ALJ found that the District violated the IDEA and denied Student FAPE throughout the period at issue but only awarded a remedy for the 2018-19 school year. The ALJ also acknowledged that calculating the amount of compensatory education "is complicated by the extensive deprivation coupled with inadequate evidence in the record regarding Student's current ability to tolerate instruction beyond the typical school day." Final Order at 155. The ALJ then roughly calculated a year of kindergarten education as 900 hours.[11] As discussed above, the ALJ had discounted the District's argument and testimony about Student's "stamina" and inability to attend school for more than two hours. The ALJ, however, allowed for changes to the timing of

_____

[11] The reasonableness of the ALJ's calculation is demonstrated by OAR 581-022-2320(1)(a), which establishes 900 hours as the "minimum hours of instructional time" that 80 percent of students in a school and 92% of students in a district must receive in kindergarten.

the compensatory education depending on Student's actual tolerance level. The ALJ also considered Student's IEP in awarding the remedy. The ALJ did not abuse his discretion.

### b. FBA Remedy

The District argues that the ALJ's order that the District conduct an FBA was improper and based solely the ALJ's notion of sound educational policy because it was not based on any violation of the District or action or inaction by the District. The District asserts the ALJ ordered this remedy simply because of the age of the District's most recent FBA. The District also notes that Student's private provider had conducted an FBA one month before the hearing and yet the ALJ did not discuss why that FBA would not suffice.

Student responds that the ALJ found many violations by the District in the 2018-19 school year that caused a complete denial of FAPE. Student points out that among those violations, the ALJ highlighted that the District would add, remove, and change Student's accommodations and interventions without proper factual support or a proper understanding of Student's needs. Student argues that the ALJ ordered the FBA so that the District would obtain the necessary information and create an IEP that complied with the District's obligations under the IDEA, not to invoke the ALJ's beliefs about sound educational policy.

In ordering this remedy, the ALJ acknowledged that the District had "belatedly" met its obligation to evaluate Student in all areas of suspected disability (the October 2018 FBA). The ALJ next discussed that the only BSP drafted from an FBA was the October 2018 BSP. Thus, the ALJ concluded that the District met its obligations in October 2018. The ALJ noted, however, that because Student had engaged in private ABA therapy, "Student's behavior challenges and triggers have likely changed significantly since the District's FBA. Therefore, the District is ordered to conduct an FBA to determine the extent of and current triggers for Student's

aggressive behaviors and to draft an appropriate BSP to assist him/her in controlling such outbursts." Final Order at 157.

Parents filed the Due Process Complaint on March 20, 2019, five months after the October 2018 FBA and BSP. Considering remedies for the District's violations during the period at issue, the Court agrees with the District that a new FBA was not warranted when one was conducted only five months before Parents filed the Due Process Complaint. The Court, therefore, reverses the ALJ's award of this remedy.

## CONCLUSION

The ALJ's decision is AFFIRMED IN PART and REVERSED IN PART. The Court affirms the decision in all aspects except the requirement that the District conduct a new FBA.

**IT IS SO ORDERED**.

DATED this 1st day of July, 2021.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge